## LICENSE AGREEMENT

This License Agreement (the "Agreement"), effective as of September 1, 2019 (the "Effective Date"), is by and between DT Inventions LLC, a Texas limited liability company along with its affiliated entities, including Practically Impossible Labs, LLC, a Texas limited liability company (collectively, "DTI") and Handle Preforms LLC, a Delaware limited liability company ("Licensee") (collectively "the Parties").

Licensee desires to obtain, and DTI agrees to provide to Licensee, a license under certain intellectual property of DTI to practice such intellectual property and other rights of DTI pursuant to the terms and conditions of this Agreement.

1.      **Definitions**. In addition to those terms defined throughout the Agreement, the following terms shall have the following definitions:

1.1     "Confidential Information" means the Disclosing Party's confidential, proprietary, and trade secret information, including information concerning the Disclosing Party's products; employees; features; specifications; designs; plans; drawings; data; prototypes; business and financial information; names, job positions, and responsibilities of its employees and independent contractors; and all other information that the Receiving Party knows or reasonably should know is proprietary or confidential or that a reasonable person in similar circumstances would consider to be confidential or proprietary. The Confidential Information of the Disclosing Party also includes any other information belonging to a third party to whom the Disclosing Party owes a duty of confidentiality. DTI's "Confidential Information" further includes all DTI IP and Developments. Confidential Information does not include any information that is: (a) in, or becomes part of, the public domain other than by disclosure by the Receiving Party in violation of this Agreement; (b) demonstrably known to the Receiving Party, without a duty of confidentiality, prior to its receipt of the information from the Disclosing Party; (c) independently developed by the Receiving Party outside of this Agreement and without reference to, access to, or use of the Disclosing Party's Confidential Information; or (d) rightfully obtained by the Receiving Party from third parties without a duty of confidentiality.

1.2     "Developments" means all updates, modifications, adaptations, and improvements made by either party to any of the DTI IP.

1.3     "Disclosing Party" has the meaning ascribed to it in Section 6.1.

1.4     "DTI IP" means all intellectual property relating to DTI's BottleOne™ technology that is either owned by DTI or to which DTI has the appropriate rights, excluding the BottleOne™ trademark and any other trademarks owned by DTI.  DTI IP includes the Patents, trade secrets, know-how and other materials related to DTI's BottleOne™ technology.

1.5     "Management" has the meaning ascribed to it in Section 12.3.

1.6     "Patents" means those patents described in Exhibit A attached hereto.

1.7     "Products" means those products described in Exhibit A attached hereto.

1.8     "Receiving Party" has the meaning ascribed to it in Section 6.1.

1.9     "Records" has the meaning ascribed to it in Section 8.

1.10    "Royalties" means those royalties due from Licensee to DTI in consideration for the licenses granted to Licensee hereunder and that are specified in Exhibit A attached hereto.

1.11    "Sell-Off Period" has the meaning ascribed to it in Section 11.3.

TAT

1

09/02/2019

303383638 v6

1.12 "Term" means that period of time commencing on the Effective Date and continuing for the term of years specified in Exhibit A attached hereto.

1.13 "Use Restrictions" means those restrictions on Licensee's use of the DTI Trademarks, the DTI IP and on sale of the Products as set forth in Section 4 below.

1.14 "Customer Agreement" means a written agreement between DTI and a Dairy Customer providing for adequate control and protection of confidentiality of the DTI IP and containing other such terms as may be required by DTI at its sole discretion.

1.15 "DTI Trademarks" means the BottleOne™ trademark in word form and any figurative forms and variations thereof as may be developed by DTI in the future.

1.16 "Dairy Customer" means a manufacturer of dairy products.

2. **Exclusive License of DTI IP.**

2.1 Subject to the terms and conditions of this Agreement and conditioned upon Licensee's payment of the Royalties when due, DTI hereby grants to Licensee, and Licensee hereby accepts, an exclusive license to exploit the DTI IP solely to make (exclusivity subject to Section 2.2 below), have made (subject to Section 4.3 below), offer to sell, and to sell the Products during the Term (including the Sell-Off Period) solely to Dairy Customers in North America who have a Customer Agreement in place with DTI ("Agreed Dairy Customers"). All goodwill arising from Licensee's use of the DTI IP shall inure solely to DTI.

2.2 DTI covenants that during the Term and subject to Section 2.3, DTI will not license the DTI IP and Patents to any third party to manufacture the Products for sale to Agreed Dairy Customers. The Parties agree that DTI may license Agreed Dairy Customers to manufacture the Products themselves for their own use however such license shall not include either of: 1) a right to manufacture the Products and sell those Products to other Agreed Dairy Customer; and 2) a right to purchase the Products from a manufacturer other than Licensee. For application where the Agreed Dairy Customer requires a third party to manufacture and deliver the Products on the Agreed Dairy Customer's site, Licensee shall be the third party manufacturer.

2.3 Licensee covenants that (a) it will invest the resources, time, and effort deemed necessary by DTI to satisfy the market demand for Products in a timely and professional manner and to ensure that each Agreed Dairy Customer is able to purchase all of its requirements for Products; and (b) it will not engage or partner with any third party in connection with the provisioning to Licensee or the use by Licensee of any technology, intellectual property, know-how, or other methods relating in any manner to bottle handles that compete with DTI or the DTI IP. If DTI provides notice to Licensee that an Agreed Dairy Customer requires Products, then Licensee shall have sixty (60) days to notify DTI that it cannot supply Products to the Agreed Dairy Customer in which case DTI shall have the right to license the DTI IP to a third party for the purposes of supplying such Agreed Dairy Customer and any dairy manufacturer within a 250 mile radius of such Agreed Dairy Customer, provided however, if the 250 mile radius is over an ocean, then the radius shall be expanded to 350 miles.

2.4 Patent marking. Licensee agrees to follow the instructions of DTI to mark the Products in accordance with 35 USC §287(a) by fixing thereon a notice in the form of the word "patent" or the abbreviation "pat." together with a website as shall be indicated by DTI reasonably from time to time or, when due to the character of the Products this cannot be done, by fixing to it, or to the package wherein one or more of the Products is contained, a label containing a like notice.

2.5 The Parties agree that the covenants and agreements specified in Sections 2.2, 2.3 and 2.4 above are reasonable and that the other party would not enter into this Agreement but for the protections offered by such covenants.

3. **Non-exclusive License of DTI Trademarks.**

TAT

3.1  <u>License Grant</u>.  Subject to the terms and conditions of this Agreement and conditioned upon Licensee's payment of the Royalties when due, DTI hereby grants to Licensee, and Licensee hereby accepts, a non-exclusive license to use the DTI Trademarks on promotional materials intended for and on Products and/or packaging for Products sold to Agreed Dairy Customers during the Term (including the Sell-Off Period) ("Licensed Trademark Uses").

3.2  <u>Use of DTI Trademarks</u>.  Licensee agrees to use the DTI Trademarks for the Licensed Trademark Uses and to do so in the form as may be reasonably instructed by DTI from time to time (for example, including a registration symbol upon registration thereof).  If technically feasible and economically reasonable, Licensee agrees to place the DTI Trademarks on the Products.  Regardless, Licensee agrees to place the DTI Trademarks on the labeling and/or packaging of the Products, using its best judgment depending upon the manner of labeling, packaging and shipping the Products.  All goodwill arising from Licensee's use of the DTI Trademarks shall inure solely to DTI.

3.3  <u>Quality Control</u>.  Licensee agrees that goods associated with the DTI Trademarks will be of high quality, at least equal to or better than the quality of other goods currently sold in connection with the DTI Trademarks, and that Licensee will conduct itself in a manner so as to preserve the goodwill associated with the DTI Trademarks, will not do anything that would damage or depreciate such goodwill, and will cooperate with DTI in taking such actions as are reasonably necessary or desirable to ensure quality compliance, as may be reasonably specified by DTI from time to time. Licensee shall provide copies of labels, advertising and promotional materials, and other signage or uses of the DTI Trademarks for review by DTI in a timely manner upon the reasonable request of DTI.

3.4  <u>Retention of Ownership</u>. Licensee acknowledges that DTI is the owner of the DTI Trademarks and that DTI retains all ownership rights, subject to the limited license granted pursuant to this License Agreement.  DTI has the right, but not the obligation, to apply to register the DTI Trademarks, in all forms and variations, as a trademark or service mark, as the case may be, with any or all state, federal or foreign trademark authorities as DTI shall, in its sole discretion, determine. Licensee shall cooperate with DTI to sign all documents, provide adequate specimens and information, and to take all steps reasonably necessary to allow DTI to register the DTI Trademarks as so determined.

4.  **Restrictions**.

4.1  Licensee shall not under any circumstance: (a) use, or allow any third party to use, the DTI Trademarks or any DTI IP in any manner that does not comply with all applicable laws, regulations, rules, ordinances, and other legal requirements of all applicable jurisdictions; (b) use, or allow any third party to use, the DTI Trademarks or DTI IP in any manner that does not comply with any reasonable use guidelines provided by DTI to Licensee from time to time in writing and in advance; (c) assign, sub-license, lease, rent, loan, transfer, grant any rights, or otherwise make available to any third party any of the DTI Trademarks or other DTI IP or otherwise permit any third party to make use of the DTI Trademarks or any other DTI IP without the express prior written consent of DTI, which may be withheld in its sole discretion; (d) disclose or grant any access to any of the DTI IP, know-how or Confidential Information to any third party without DTI's written permission; (e) adapt, alter, translate, reproduce, copy, reverse engineer, decompile, disassemble, or create any derivative works of any of the DTI IP; (f) use the Patents or any of the other DTI IP to develop any products, methods, or other intellectual property that is similar to any of the DTI IP or otherwise competes with DTI; (g) remove, alter, or obscure any proprietary notice on any portion of the DTI IP; (h) infringe upon, misappropriate, or otherwise violate the DTI Trademarks or any DTI IP; or (i) use or permit to be used the DTI Trademarks or the DTI IP, make or have made any Product, or sell or offer to sell any Product other than as expressly authorized by this Agreement.

4.2  Licensee acknowledges and agrees that the Use Restrictions are reasonable and that DTI would not enter into this Agreement but for the Use Restrictions and Licensee's assurance to DTI of its compliance therewith.

4.3     To the extent Licensee desires to engage, hire, or contract with any third party to produce Products on behalf of Licensee, such third party (an "Authorized Supplier") must be a supplier or vendor selected by Licensee, with consent of DTI and such consent not to be unreasonably withheld. Each Authorized Supplier must have received the necessary rights to use the DTI IP, along with appropriate training and know-how, directly from DTI, and Licensee is not permitted to sub-license any rights granted by DTI to Licensee hereunder to such Authorized Supplier. Licensee warrants that in any agreement with an Authorized Supplier for any such arrangement, Licensee will (a) include audit provisions substantially similar to those specified in Section 8 hereof, and (b) specify that DTI is a third party beneficiary of such agreement, including the audit provisions thereof.

5.     **Property Rights**.

5.1     Ownership of DTI IP. Licensee acknowledges that the DTI IP includes valuable trade secrets and know-how of DTI. As between DTI and Licensee, DTI is and shall remain the sole and exclusive owner of all worldwide right, title, and interest (including all intellectual property rights) in and to the DTI Trademarks and to all DTI IP, including the Patents and any other materials or intellectual property provided by DTI to Licensee and further including all updates, modifications, adaptations, and improvements thereto. This Agreement does not convey or transfer to Licensee or any other party the ownership of any such right, title, or interest in or to the DTI Trademarks, the DTI IP, the Patents, or any other materials or intellectual property provided by DTI to Licensee or to any updates, modifications, adaptations, or improvements thereto.

5.2     Assignment. All worldwide right, title, and interest in and to all Developments, including all intellectual property rights thereto, shall belong solely and exclusively to DTI, and Licensee hereby irrevocably and unconditionally assigns and transfers to DTI, immediately upon the creation thereof, all worldwide right, title, and interest in and to such Developments, including all intellectual property rights thereto. To the extent any of such rights in the Developments are not capable of assignment under applicable law or otherwise, Licensee hereby irrevocably and unconditionally waives all enforcement of such rights to maximum extent permitted under applicable law. To the extent such waiver is deemed unenforceable under applicable law, Licensee hereby grants to DTI a non-exclusive, worldwide, perpetual, irrevocable, royalty-free, fully paid-up license to fully reproduce, modify, publicly display, create derivative works based upon and otherwise use in any manner whatsoever the Developments, including the right to sub-license or transfer such Developments to any third party. DTI shall have the sole right, in its discretion, to patent or otherwise register for the protection of the Developments. Licensee is responsible for obtaining all rights, permissions, assignments, and authorizations necessary for Licensee to fulfill its obligations pursuant to this Section 5.2, and Licensee agrees to execute all documents reasonably requested by DTI for the purpose of perfecting or recording any rights granted hereunder, including applying for and obtaining domestic and foreign patent and copyright registrations. To the extent any Development is attributable to an improvement made by Licensee to any of the DTI IP, then, subject to the terms and conditions of this Agreement, DTI hereby grants to Licensee a non-exclusive, non-transferable license to such Development to make, have made (subject to Section 4.3 above), offer to sell, and to sell the Products during the Term (and the Sell-Off Period) solely to Agreed Dairy Customers. All goodwill arising from Licensee's use of the Developments shall inure solely to DTI.

5.3     Future Developments. If during the course of performance under this License Agreement any new or improved methodologies, processes, tools, technologies, or materials are created or acquired by Licensee alone without DTI's involvement, participation, or input, excluding DTI IP, the Patents, and the Developments, these shall remain the sole and exclusive property of Licensee (the "Licensee IP"). Licensee is permitted to file for whatever intellectual property protection, including filing for a patent, it deems appropriate to protect the Licensee IP; provided, however, that it does not disclose any of the DTI IP, Patents, or Developments. If Licensee makes any public disclosure of the Licensee IP, including by filing for patent protection, it shall take all actions reasonably requested by DTI and permitted by law, including by distorting and/or placing a shaded area over all representations of the DTI IP, Patents, and Developments, to make impossible for a third party to obtain, adapt, alter, translate, reproduce, copy, reverse engineer, decompile, disassemble, or create any derivative works of any such DTI IP, Patent, or Developments. Licensee hereby agrees, upon request by DTI, to negotiate in good faith with DTI a royalty-based, assignable, sub-licensable, exclusive license to make, have made, use, offer to sell, sell, and import the Licensee IP in non-dairy markets. In the event that any methodologies, processes, tools, technologies, and materials unrelated to the DTI IP (i.e., excluding DTI IP, the Patents, and the Developments) are jointly created by Licensee and DTI ("Unrelated Joint Developments") during the Term, the Unrelated Joint Developments and any

Intellectual Property related thereto shall be owned by DTI, Licensee agrees to assign all rights to Unrelated Joint Developments to DTI, and DTI agrees to grant Licensee a royalty-free, non-assignable, non-exclusive license to make, use, offer to sell, sell, and import the Unrelated Joint Developments solely for licensed activity of Licensee falling within the scope of this License Agreement during the Term.

5.4     Enforcement against Third Parties.  DTI reserves the right, but shall have no obligation, to: (a) prosecute, defend, and conduct any pending or threatened claim, demand, arbitration, action, litigation, or like proceeding, including any claim of infringement, misappropriation, invalidity, unenforceability, or other unauthorized use by a Third Party of the DTI Trademarks, the DTI IP, the Developments, and the Unrelated Joint Developments; (b) take any action or institute any proceeding that it may deem proper or necessary for the protection of the DTI Trademarks, the DTI IP, the Developments, and the Unrelated Joint Developments, in each case at its own expense with counsel of its choice; and (c) enter into a stipulation with respect to, or a discontinuance and settlement of, any claim or action, in its discretion.  Licensee shall have no claim to proceeds of any action brought by DTI.

5.5     Notification by Licensee.  Licensee shall: (a) upon becoming aware thereof, promptly notify DTI in writing of any claim or potential claim of infringement, misappropriation, invalidity, unenforceability or other unauthorized use by a Third Party of the DTI Trademarks, the DTI IP, the Developments, or the Unrelated Joint Developments; and (b) cooperate with DTI as is reasonably necessary to the prosecution or defense of any claim or action resulting therefrom.

5.6     Reservation of Rights. Unless expressly included herein, no other rights are granted to either party pursuant to this Agreement, whether implicit, by estoppel, or otherwise.

6.     Confidentiality.

6.1     Each party (the "Receiving Party") acknowledges that the other party (the "Disclosing Party") has revealed or may reveal to the Receiving Party, and that the Receiving Party may obtain by virtue of this Agreement, the Confidential Information of the other party. The Receiving Party agrees to take commercially reasonable and appropriate action to maintain in confidence all such Confidential Information of the Disclosing Party that is in Receiving Party's possession, which shall not be less than the standard of care imposed by state and federal laws and regulations relating to the protection of such information and, in the absence of any legally imposed standard of care, such action to be no less protective than the actions the Receiving Party takes to protect its own information of a similar nature to the Disclosing Party's Confidential Information, and in a manner adequate to protect the Disclosing Party's proprietary rights in its Confidential Information. In furtherance of the foregoing, the Receiving Party will treat as confidential and will not, without the prior written approval of the Disclosing Party, use or copy (other than in the performance of its duties hereunder or otherwise permitted hereunder), publish, disclose, sell, assign, license, market, transfer, copyright or authorize anyone else to do the same, either during the Term or subsequent thereto, any Confidential Information of the Disclosing Party. For that Confidential Information of the Disclosing Party that is a trade secret under applicable law, the Receiving Party agrees to protect such trade secret information for so long as such information remains a trade secret under applicable law and not to use or disclose such trade secrets except as authorized in writing by the Disclosing Party. All Confidential Information, in whatever form provided or obtained, will remain the property of the Disclosing Party.

6.2     The Receiving Party agrees to limit disclosure of this Agreement, the terms and conditions hereof and any Confidential Information of the Disclosing Party to only those agents, employees and subcontractors of such party who have a need to know such Confidential Information for the purpose of the Receiving Party's performance hereunder and only if those employees, agents and subcontractors have been advised of and agree to be bound by confidentiality obligations substantially similar to those contained in this Agreement. Each party agrees that it will be responsible for any breach of the confidentiality provisions of this Agreement by its employees, agents and subcontractors.

6.3     If the Receiving Party is required to disclose all or any part of the Disclosing Party's Confidential Information by applicable law or under a subpoena or inquiry issued by a court of competent jurisdiction or a judicial or administrative agency, the Receiving Party shall provide to the Disclosing Party prompt notice of each

such requirement, to the extent not prohibited thereby, so that the Disclosing Party may seek an appropriate protective order or waive compliance with the provisions of this Agreement or both. The Receiving Party shall reasonably assist, at the Disclosing Party's request and expense, the Disclosing Party's efforts in contesting or limiting such required disclosure. If, absent the entry of a protective order or the receipt of a waiver under this Agreement, the Receiving Party so obligated is, in the written opinion of such party's legal counsel, legally compelled to disclose such information, under penalty of liability for contempt or other censure or penalty, the Receiving Party may disclose such information to the persons and to the minimum extent required without liability under this Agreement.

6.4    The Receiving Party agrees to return or destroy (and certify in writing to such destruction), within ten (10) business days of the termination or expiration of this Agreement or the Disclosing Party's request and at the Disclosing Party's direction, all documents and other materials embodying Confidential Information, and the Receiving Party will retain no copies (written, electronic, or otherwise) thereof. Notwithstanding the foregoing, the Receiving Party shall be entitled to retain one (1) copy of the Confidential Information in tangible form for regulatory and legal defense purposes, and such retained copy shall at all times remain subject to the confidentiality obligations of this Agreement.

7.    **Royalties**.

7.1    Licensee agrees to pay to DTI the Royalties. Royalties will be calculated and paid to DTI within by the 15th of the month following the end of each calendar quarter (i.e., Apr. 15, July 15, Oct. 15, Jan 15), unless such day falls on a weekend or holiday, in which case payment shall be due the next business day. Along with payment of the Royalty, Licensee shall also deliver to DTI a written report demonstrating Licensee's calculation of the Royalty. If DTI disputes Licensee's calculation of any Royalty, DTI shall notify Licensee of such in writing and Licensee will provide any further evidence requested by DTI demonstrating Licensee's calculation of the Royalty. If after receipt of such additional evidence DTI still disputes Licensee's calculation of such Royalty, DTI and Licensee shall commence meetings with appropriate personnel to work together in good faith to resolve such dispute. If after such meetings Licensee admits that it under-calculated the Royalty due to DTI, Licensee shall, within five (5) business days of such discovery, pay such deficiency to DTI. If, however, after such meetings the parties still cannot agree upon the proper calculation of the Royalties, such dispute will be referred to the dispute resolution process set forth in Section 11.3 below.

7.2    If Licensee does not render full payment of the Royalties to DTI within thirty (30) days of the date such Royalty is due, (a) a late payment fee then shall accrue at the lesser of 1.5% per month or the maximum rate allowed by law, calculated from the date the Royalty was first due, and (b) DTI may, unless the amount of such Royalty is in dispute (in which event the provisions of Section 7.1 shall apply), upon written notice to Licensee, suspend the licenses granted to Licensee pursuant to Sections 2 and 3 hereof. While such license is suspended, Licensee agrees that it is prohibited from making, using, having made, offering to sell, selling and importing the Products. Unless otherwise agreed by DTI in a signed writing, if Licensee does not render full payment of the Royalties to DTI within sixty (60) days of the date such Royalty is due, the licenses granted to Licensee pursuant to Sections 2 and 3 hereof shall automatically be revoked, this Agreement shall automatically terminate, and Licensee agrees to immediately cease making, using, having made, offering to sell, selling and importing the Products and cease using the DTI Trademarks. Licensee also agrees to reimburse DTI for its costs of collection, including reasonable attorneys' fees, for all undisputed amounts that remain unpaid after the applicable due date.

7.3    At the end of the Term, the Parties agree to meet and discuss in good faith a new License Agreement on mutually agreeable terms and for a mutually agreed duration.

7.4    If DTI is required to pay any sales, use or other taxes related to the delivery or Licensee's use of any of the DTI IP, Licensee's sale of any Products, or DTI's performance hereunder, then such taxes shall be billed to and be paid by Licensee; provided, however, that DTI shall be solely responsible for the payment of taxes based on or measured by DTI's income, and taxes imposed on DTI as a condition of doing business in any jurisdiction. Licensee will make all payments of the Royalties to DTI free and clear of, and without reduction for, any withholding taxes. Any such taxes imposed on payments of the Royalties will be Licensee's sole responsibility, and Licensee will provide DTI with official receipts issued by the appropriate taxing authority, or such other evidence as DTI may reasonably request, to establish that such taxes have been paid.

8.      **Audits**. Licensee will maintain adequate books, records, documentation, and systems sufficient to allow verification of accurate calculation of the Royalties, including, but not limited to, the total number of Products produced by Licensee, and Licensee's compliance with the terms of this Agreement ("Records"). Licensee will allow DTI, or a third party on DTI's behalf, to inspect and audit such Records as well as Licensee's facilities where any DTI IP is used or the Products are made in order for DTI, or such third party, to verify compliance with this Agreement. Such inspections and audits may include testing the scales and other tools used by Licensee to measure the weight of the Products to ensure accurate measurements and to confirm that the Products conform to the specifications for such Products (including design drawings) and the requirements of this Agreement. Licensee will, at no additional cost to DTI, reasonably facilitate and cooperate with any such inspection and audit. If any inspection or audit uncovers any failure to comply with the terms of this Agreement, in addition to all other remedies available to DTI at law or in equity, including those stated herein, Licensee shall promptly work to correct such failure and provide DTI sufficient evidence thereof. Once such correction has been implemented, DTI, or a third party on its behalf, may repeat its inspection and audit of the Records and Licensee's facilities pursuant to this Section to verify that such correction is sufficient and has been properly implemented. Except with respect to such repeat inspections and audits, DTI may not exercise its rights under this Section more than once per year and financial audits to verify Licensee's correct calculation and payment of Royalties shall only be performed upon the conclusion of Licensee's fiscal year (December 31). DTI also agrees to provide at least thirty (30) days' advance written notice of any inspection or audit. If any Audit reveals that Royalties have been under-calculated by Licensee, Licensee shall promptly pay such amount to DTI and, if such under calculation exceeds five percent (5%), Licensee shall also reimburse DTI for its reasonable costs of audit.

9.      **Indemnification**.

9.1      DTI will defend, and hold Licensee harmless from, with counsel of its own choosing, any action against Licensee brought by a third party alleging that any DTI IP infringes any intellectual property right registered in the United States, and DTI will pay those costs and damages finally awarded in any such action (including any attorneys' fees so awarded) that are specifically attributable to such claim or those costs and damages agreed to in a monetary settlement of such action.

9.2      If any portion of the DTI IP becomes or, in DTI's opinion, is likely to become, the subject of an infringement claim, DTI may, in its sole discretion, either: (a) procure the appropriate rights to the DTI IP; (b) modify the DTI IP so that it becomes non-infringing but remains functionally equivalent; or (c) upon written notice to Licensee, terminate this Agreement (but without prejudice to DTI's indemnity obligations contained in Section 9.1 above).

9.3      Notwithstanding the foregoing, DTI will have no obligation under this Agreement with respect to any infringement claim based upon or arising from: (a) any use of the DTI IP that is not authorized by this Agreement, that otherwise violates any provision of this Agreement, or for purposes not contemplated hereby; (b) any use of the DTI IP in combination with other products, equipment, software, or data not supplied or specified in writing by DTI where such infringement would not have occurred but for such combination; (c) any modification of the DTI IP, or (d) any specifications, instructions, or directions provided by or on behalf of Licensee (the "Indemnification Exclusions"). Licensee will defend, with counsel of its own choosing, any action against DTI brought by a third party arising from or relating to any Indemnification Exclusion, and Licensee will pay those costs and damages finally awarded in any such action (including any attorneys' fees so awarded) that are specifically attributable to such claim or those costs and damages agreed to in a monetary settlement of such action.

9.4      Licensee will defend, and hold DTI harmless from, with counsel of its own choosing, any action against DTI brought by a third party alleging: (a) that any intellectual property of Licensee infringes any intellectual property right registered in the United States; or (b) damages arising from or related to the Product or the use thereof, including product liability claims but excluding any claims for which DTI is required to defend pursuant to Section 9.1 above. Licensee will pay those costs and damages finally awarded in any such action (including any attorneys' fees so awarded) that are specifically attributable to any such claim or those costs and damages agreed to in a monetary settlement of any such action.

9.5      Each party's (the "Indemnitor") indemnification obligations to the other party (the "Indemnitee") under this Section 9 are conditioned on: (a) the Indemnitee notifying the Indemnitor promptly in writing of such

action; provided, however, that any failure or delay in providing such notice shall not void the Indemnitee's rights to indemnification hereunder unless and the only to the extent such failure or delay materially prejudiced the Indemnitor's defense of the claim; (b) the Indemnitee giving the Indemnitor sole control of the defense thereof and any related settlement negotiations; provided, however, that any settlement admitting any fault or culpability on the part of the Indemnitee shall require the Indemnitee's prior written approval; and (c) the Indemnitee cooperating and assisting the Indemnitor in its defense of such claim.

9.6     THIS SECTION 9 STATES EACH PARTY'S ENTIRE LIABILITY AND THE OTHER PARTY'S SOLE AND EXCLUSIVE REMEDY FOR INFRINGEMENT CLAIMS AND ACTIONS.

10.     Disclaimer of Warranties; Limitation of Liability.

10.1     EXCEPT AS PROVIDED ABOVE, AND TO THE MAXIMUM EXTENT OTHERWISE ALLOWABLE UNDER APPLICABLE LAW, THE DTI IP, PATENTS, THE DTI TRADEMARKS, AND ALL OTHER MATERIALS PROVIDED BY DTI HEREUNDER ARE PROVIDED STRICTLY ON AN AS-IS BASIS, AND DTI MAKES NO OTHER REPRESENTATIONS OR WARRANTIES, AND HEREBY EXPRESSLY DISCLAIMS ALL OTHER REPRESENTATIONS AND WARRANTIES, WITH RESPECT TO DTI IP, PATENTS, TRADEMARKS, AND OTHER SUCH MATERIALS, THE USE THEREOF, OR OTHERWISE IN RELATION TO THIS AGREEMENT, WHETHER EXPRESS, IMPLIED, STATUTORY, OR OTHERWISE, INCLUDING ANY WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE, OR NON-INFRINGEMENT OF THIRD PARTY RIGHTS. DTI DOES NOT REPRESENT OR WARRANT THAT ANY DTI IP, PATENT, OR ANY OTHER MATERIAL PROVIDED BY DTI WILL BE ERROR-FREE, AND LICENSEE ACKNOWLEDGES AND AGREES THAT IT HAS RELIED ON NO WARRANTIES WITH RESPECT TO ITS USE OF THE DTI IP, PATENTS, OR OTHER SUCH MATERIALS AND THAT ITS USE THEREOF IS STRICTLY AT ITS OWN RISK. THESE DISCLAIMERS WILL APPLY NOTWITHSTANDING THE FAILURE OF THE ESSENTIAL PURPOSE OF ANY LIMITED REMEDY PROVIDED HEREIN.

10.2     TO THE MAXIMUM EXTENT ALLOWABLE UNDER APPLICABLE LAW, IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR ANY CONSEQUENTIAL, INDIRECT, EXEMPLARY, PUNITIVE, SPECIAL OR INCIDENTAL DAMAGES, INCLUDING ANY LOST PROFITS OR BUSINESS OPPORTUNITIES, ARISING FROM OR RELATING TO THIS AGREEMENT. EXCEPT WITH RESPECT TO ALL INDEMNIFICATION OBLIGATIONS PURSUANT TO SECTION 8 HEREOF, EACH PARTY'S TOTAL CUMULATIVE LIABILITY TO THE OTHER PARTY IN CONNECTION WITH THIS AGREEMENT, ALL DISPUTES UNDER THIS AGREEMENT, AND FOR ALL DAMAGES ARISING FROM OR RELATING TO THIS AGREEMENT, THE DTI IP, THE DTI TRADEMARKS, THE PATENTS, OR ANY OTHER MATERIALS PROVIDED BY OR ON BEHALF OF DTI PURSUANT THIS AGREEMENT, WHETHER IN CONTRACT OR TORT OR OTHERWISE, WILL NOT EXCEED THE AGGREGATE ROYALTIES ACTUALLY PAID BY LICENSEE TO DTI UNDER THIS AGREEMENT IN THE 12 MONTHS IMMEDIATELY PRIOR TO THE EVENT GIVING RISE TO LIABILITY. LICENSEE ACKNOWLEDGES THAT THESE LIMITATIONS OF LIABILITY FORM AN ESSENTIAL PART OF THIS AGREEMENT AND THAT THE ROYALTIES REFLECT THE ALLOCATION OF RISK SET FORTH IN THIS AGREEMENT AND THAT DTI WOULD NOT ENTER INTO THIS AGREEMENT ON THESE TERMS WITHOUT THESE LIMITATIONS ON ITS LIABILITY.

11.     Term; Termination.

11.1     This Agreement and the licenses granted hereunder shall commence on the Effective Date and continue for the duration of the Term, unless otherwise terminated pursuant to the terms of this Agreement.

11.2     In addition to any other rights of termination included in this Agreement, if either party materially breaches any provision of this Agreement and such breach remains uncured (if curable) for thirty (30) days after the date the breaching party received written notice from the non-breaching party of such breach, then the non-breaching party may terminate this Agreement by sending additional written notice of termination to the breaching party.

11.3     Immediately upon termination or expiration of this Agreement and regardless of the reason for such termination: (a) all licenses and rights granted hereunder shall immediately terminate; (b) Licensee shall cease production of the Products and use of the DTI Trademarks; (c) Licensee shall either return or destroy, at DTI's direction, all records, copies, and instances within Licensee's possession or control of the DTI IP, the Patents, the Developments, and all other DTI Confidential Information and, if directed to destroy such records, copies, and instances, certify to DTI in writing that it has fully complied with such requirements (subject to Licensee's right of

retention provided in Section 6.4 hereof); (d) DTI shall either return or destroy, at Licensee's direction, all records, copies, and instances within DTI's possession or control of Licensee's Confidential Information and, if directed to destroy such records, copies, and instances, certify to Licensee in writing that it has fully complied with such requirements (subject to DTI's right of retention provided in Section 6.4 hereof); and (e) Licensee shall pay to DTI all Royalties that have accrued as of the date of termination or expiration of this Agreement. Notwithstanding the preceding, unless termination is due to Licensee's infringement or unauthorized use of the DTI IP, Licensee is permitted a 180 day period (the "Sell-Off Period") to sell off those Products already manufactured but unsold as of the effective date of the termination or expiration of this Agreement, subject to Licensee's continued payment of the Royalties applicable to such Products. All terms applicable to the sale of such Products shall continue to apply during such sell-off period. Upon expiration of such sell-off period, Licensee shall (i) promptly destroy all remaining inventory of Product at Licensee's sole cost and expense, (ii) provide DTI with written notice of such remaining inventory and, (iii) upon completion of its destruction, notify DTI in writing of such completion. Licensee acknowledges that, subject to the terms of this Agreement, upon termination or expiration of this Agreement, DTI is free to reuse and/or license all DTI IP with any third party, including, for the avoidance of doubt, re-using, licensing, or selling all tangible DTI IP with or to any third party upon DTI's receipt thereof.

11.4   All provisions of this Agreement that by their nature are intended to survive the termination or expiration of this Agreement shall so survive, including Sections 1, 4-10, 11.3, 11.4, 12, and 13.

## 12.   Governing Law; Dispute Resolution.

12.1   This Agreement and all disputes arising under or related hereto shall for all purposes be governed and interpreted solely and exclusively by the laws of the State of Texas without reference to its conflict of laws principles.

12.2   Each party shall designate one employee to act on its behalf with regard to matters arising under this Agreement who shall be the person the other party shall contact in writing regarding matters concerning this Agreement (the "Relationship Manager"). Each party's Relationship Manager is identified on Exhibit A.

12.3   The following procedure will be adhered to in all disputes arising under or related to this Agreement that the parties cannot resolve informally through their respective Relationship Managers. The aggrieved party shall notify the other Party in writing of the nature of the dispute with as much detail as possible about the deficient performance of the other party. The Relationship Managers shall meet (in person or by telephone) within seven (7) calendar days (or other mutually agreed upon date) after the date of the written notification to reach an agreement about the nature of the deficiency and the corrective action to be taken by the respective parties. If the Relationship Managers do not meet or are unable to agree on corrective action, senior managers of the parties having authority to resolve the dispute without the further consent of any other person ("Management") shall meet or otherwise act to facilitate an agreement within fourteen (14) calendar days (or other mutually agreed upon date) of the date of the written notification. If Management do not meet or cannot resolve the dispute or agree upon a written plan of corrective action to do so within seven (7) calendar days (or other mutually agreed upon date) after their initial meeting or other action, or if the agreed-upon completion dates in the written plan of corrective action are exceeded, either party may request arbitration as provided for in this Agreement. Except as otherwise specifically provided, neither party shall initiate arbitration or litigation unless and until this dispute resolution procedure has been substantially complied with or waived. Failure of a party to fulfill its obligations in this Section, including failure to meet timely upon the other party's notice, shall be deemed such a waiver.

12.4   Any controversy or claim, other than those specifically excluded, between or among the parties not resolved through the procedures described in Section 12.3 shall at the request of either party be determined by arbitration. The arbitration shall be conducted by one (1) independent arbitrator (the "Arbitrator") mutually agreed to by the parties or, if unable to reach agreement, selected pursuant to the Commercial Arbitration Rules of the American Arbitration Association. The arbitration shall be held in Harris County, Texas in accordance with the United States Arbitration Act (9 U.S.C. 1 et seq.), notwithstanding any choice of law provision in this Agreement, and under the auspices and the Commercial Arbitration Rules of the American Arbitration Association. Consistent with the expedited nature of arbitration, each party will, upon the written request of the other party, promptly provide the other with copies of documents relevant to the issues raised by any claim or counterclaim on which the producing party may rely in support of or in opposition to any claim or defense. At the request of either party, the

Arbitrator shall have the discretion to order examination by deposition of witnesses to the extent the Arbitrator deems such additional discovery relevant and appropriate. Depositions shall be limited to a maximum of three (3) per party and shall be held within thirty (30) calendar days of the making of a request. Additional depositions may be scheduled only with the permission of the Arbitrator, and for good cause shown. Each deposition shall be limited to a maximum of three (3) hours duration. All objections are reserved for the arbitration hearing except for objections based on privilege and proprietary or confidential information. Any dispute regarding discovery, or the relevance or scope thereof, shall be determined by the Arbitrator, which determination shall be conclusive. All discovery shall be completed within sixty (60) calendar days following the appointment of the Arbitrator. The Arbitrator shall give effect to statutes of limitation in determining any claim, and any controversy concerning whether an issue is arbitrable shall be determined solely by the Arbitrator. The Arbitrator shall follow the law in reaching a reasoned decision and shall deliver a written opinion setting forth findings of fact, conclusions of law and the rationale for the decision. The Arbitrator shall reconsider the decision once upon the motion and at the expense of either party. Judgment upon the decision rendered by the Arbitrator may be entered in any court having jurisdiction.

12.5 Licensee acknowledges that the DTI IP, Patents, and Developments contain valuable trade secrets and proprietary information of DTI and its suppliers and that any actual or threatened breach of Sections 2, 3, 4, 5 or 6 or any other misappropriation of any DTI IP will constitute immediate, irreparable harm to DTI and its suppliers for which monetary damages would be an inadequate remedy. Accordingly, in addition to all other remedies available to DTI, Licensee agrees that injunctive or other equitable relief is an appropriate remedy for such breach or threatened breach and DTI may seek any such remedy without the need to post bond or other security or to prove the inadequacy of monetary damages, and no provision of this Section 12 shall limit the right of DTI to seek such relief from any court of competent jurisdiction before, after, or during the pendency of any arbitration. The exercise of a remedy does not waive the right of either party to resort to arbitration.

· 12.6 All arbitration proceedings, evidence taken, the decision of the Arbitrator Panel, and all other documents and information related to such proceedings shall be considered "Confidential Information" of both parties and are subject to the same degree of protection required of Confidential Information as set forth in Section 6 hereof. The requirements of Sections 12.3 and 12.4 shall not apply to any allegation of: (a) inappropriate or unauthorized use of any DTI IP, the DTI Trademarks or the Patents; (b) infringement of any DTI IP, the DTI Trademarks or the Patents; or (c) breach of a party's confidentiality obligations hereunder.

13. **General**.

13.1 Licensee will comply with all applicable laws, statutes, ordinances or regulations, including the laws and regulations governing export and import of the DTI IP and Products. Licensee shall not provide, transport, export, re-export, or otherwise make available, whether directly or indirectly and regardless of form, including through visual access, any of the DTI IP or Products without DTI's prior written consent, and in no event: (a) into Cuba, Iran, North Korea, Sudan, Syria, the Crimea region of Ukraine, or any other country subject to United States trade sanctions or embargo, or to individuals or entities controlled by such countries or to nationals or residents of such countries (other than nationals who are lawfully admitted permanent residents of countries not subject to such sanctions); (b) to anyone on any denied, prohibited, or unverified list maintained by the United States, including the United States Treasury Department's list of Specially Designated Nationals and Blocked Persons, the Foreign Sanctions Evaders List, the Sectoral Sanctions Evaders List, or the United States Commerce Department's Denied Person's or Entities lists; or (c) to anyone that Licensee knows or has reason to believe will use the DTI IP or Products in connection with prohibited proliferation-related activities, including, but not limited to, biological and chemical weapons, missile, and nuclear applications. Licensee represents and warrants that: (i) it is not located in, under the control of, a national or resident of, and shall not use the Service in any such country listed in sub-section (a) above; and (ii) it is not prohibited from participating in United States export transactions by any federal agency of the United States government.

13.2 The Parties are independent contractors and this Agreement shall not establish any relationship of partnership, joint venture, employment, franchise, or agency between the parties. Neither party shall have the power to bind the other or incur obligations on the other's behalf without the other's prior written consent.

13.3    Neither party shall assign, by operation of law or otherwise, any of its rights under this Agreement to any third party without the other party's prior consent. Any such attempted assignment that is otherwise prohibited shall be void. For the avoidance of doubt, the other party's consent is required for a Change of Control of that party; provided, however, a Change of Control of DTI shall not require Licensee's consent if such Change of Control (a) requires the assumption of this Agreement by the successor entity or (b) the DTI's successor entity covenants and agrees that Licensee shall have the rights granted under Sections 2 and 3 of this Agreement, subject to the royalty payments due DTI or its successor under Section 7 and subject to all other duties and obligations set forth in this Agreement, for ten (10) years following the Change of Control, provided however, such rights shall be limited to Licensee's Dairy Customers and customers within a 400 mile radius of Licensee's manufacturing facility at the time of the Change of Control. A "Change of Control" shall mean (i) the acquisition, directly or indirectly, by a third party of more than fifty percent (50%) of the ownership interest of a party; (ii) the acquisition by a third party of the power to control or elect a majority of the board of directors, managers, trustees, or other highest governing body of a party; or (iii) the sale of all or substantially all of the assets of a party to a third party. Notwithstanding the foregoing, each party hereby agrees to provide the other party notice of a pending Change of Control offer by a third party and the other party shall have thirty (30) days to accept the terms of the third party pending Change of Control on the same terms or conditions. If the notified party does not accept such terms within the thirty (30) day term, then the notified party shall be deemed to have consented to the Change of Control and notifying party may proceed with the third party Change of Control on the same terms and conditions offered to the notified party.

13.4    All notices, consents and approvals under this Agreement must be delivered in writing by courier, by electronic facsimile (fax), or by certified or registered mail (postage prepaid and return receipt requested) to the other party at the address set forth beneath such party's signature, and will be effective upon receipt or three (3) business days after being deposited in the mail as required above, whichever occurs sooner. Either party may change its address by giving written notice of the new address to the other party.

13.5    If any legal action is brought to enforce this Agreement, the prevailing party will be entitled to receive its attorneys' fees, court costs and other collection expenses, in addition to any other relief it may receive.

13.6    All waivers must be in writing. Any waiver or failure to enforce any provision of this Agreement on one occasion will not be deemed a waiver of any other provision or of such provision on any other occasion.

13.7    If any provision of this Agreement is unenforceable, such provision will be modified and interpreted to accomplish the objectives of such provision to the greatest extent possible under applicable law and the remaining provisions will continue in full force and effect. If such modification is not possible under applicable law, the unenforceable provision shall be stricken and the reminder of the Agreement shall continue in full force and effect.

13.8    Except as expressly provided herein, the remedies under this Agreement are cumulative and do not exclude other remedies to which a party is lawfully entitled.

13.9    Each party warrants that it has full power to enter into and perform this Agreement, and the person signing this Agreement on such party's behalf has been duly authorized and empowered to enter into this Agreement.

13.10    The section headings appearing in this Agreement are inserted only as a matter of convenience and in no way define, limit, construe, or describe the scope or extent of such section or in any way affect this Agreement. Unless otherwise expressly stated, when used in this Agreement the word "including" means "including but not limited to." Unless otherwise expressly stated, references to any section numbers in this Agreement shall mean the corresponding sections of this Agreement.

13.11    This Agreement may be executed in counterparts, by facsimile, or both, each of which will be considered an original, but all of which together will constitute the same instrument.

13.12    This Agreement together with all Exhibits attached hereto constitutes the complete and final agreement between the parties regarding the subject matter hereof and supersedes all prior or contemporaneous



understandings, agreements, or other communications between the parties, oral or written. This Agreement may be amended only in a written document signed by both parties.

*[Signature page follows]*

IN WITNESS WHEREOF, the parties have executed this Agreement as of the Effective Date.

HANDLE PREFORMS LLC

By: _____
    Gregory Kershner, Manager

Address for Notice:

120 Interstate North Parkway
Suite 100
Atlanta, Georgia 30339
Attn: Gregory Kershner

*With a copy to:*

Law Offices of David M. Walker, Esq. LLC
1170 Peachtree Street NE
Suite 1200
Atlanta, Georgia 30309
Attn: David M. Walker, Esq.
Telephone: 404-541-6551
Email: dwalker@davidmwalkeresq.com

DT INVENTIONS LLC

By: _____
    Thomas Thibodeau, Managing Member

_____
    Tim Thibodeau, Managing Member

Address for Delivery and Notice:

12239 Mosielee St.
Houston, TX 77086
Attn: Tim Thibodeau
Telephone: (832) 265-1201
Email: aberfence@aol.com

*With a copy to:*

K&L Gates LLP
1717 Main Street
Suite 2800
Dallas, Texas 75201
Attn: Nigel Stark
Telephone: (214) 939-5823
Email: nigel.stark@klgates.com

### EXHIBIT A
### TRANSACTION DETAILS

1. Patents:  9,505,163; 9,499,302; D762,119; D746,142; 9,073,667; and 8,524,143

2. Products: 64 and 128 fluid ounce polyethylene terephthalate (PET) dairy-style BottleOne™ bottle preforms manufactured or designed with the use of any DTI IP.

3. Term: 15 years, or the term of the Patents and all derivative works of the Patents, whichever is later.

4. Royalties: Three cents ($0.03) for each item of Product produced and sold by HPL

5. Relationship Managers:

    a.   For DTI, Thomas Thibodeau, Managing Member

    b.   For Licensee, Greg Kershner, CEO